**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

DAVID LOVELL, as Personal Representative
of the ESTATE OF CHASE LOVELL,

              Plaintiff,                        Case No.

-vs-                                        Hon.

                                                 Mag.

COUNTY OF KALAMAZOO, a political
subdivision of the State of Michigan,
DEPUTY REBECCA DOW, DEPUTY
BRETT BOVEN, DEPUTY THOMAS
JELSOMENO, DEPUTY CHRIS ZYWICKI,
SERGEANT HEATHER MITCAVISH,
LINDSEY O'NEIL, INTEGRATED SERVICES
OF KALAMAZOO, a political subdivision of the
State of Michigan

              Defendants.

---

JONATHAN R. MARKO (P72450)
**MARKO LAW, PLLC**
Attorney for Plaintiff
1300 Broadway Street, Fifth Floor
Detroit, MI 48226
P: (313) 777-7529 / F: (313) 771-5785
jon@markolaw.com

---

There is no other civil action between these parties arising out of the same transaction or occurrence as alleged in this Complaint pending in this Court, nor has any such action been previously filed and dismissed or transferred after having been assigned to a judge, nor do I know of any other civil action, not between these parties, arising out of the same transaction or occurrence as alleged in this Complaint that is either pending or was previously filed and dismissed, transferred or otherwise disposed of after having been assigned to a Judge in this Court.

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

1

NOW COMES Plaintiff, David Lovell, as personal representative of the Estate of Chase Lovell, deceased, by and through his attorneys, MARKO LAW, PLLC, and for his Complaint hereby states as follows:

## INTRODUCTION

1.      This is a civil rights/wrongful death action under 42 U.S.C. § 1983 resulting from a systemic indifference to incarcerated people with mental health needs at the Kalamazoo County Jail ("KCJ").

2.      As a direct result of Defendants' actions and inactions, its policies, procedures, and customs, the mental health needs of KCJ inmates are routinely ignored.

3.      Chase Lovell ("Chase") was incarcerated, under Defendants' care, with obvious and known mental health needs, whose suicidal ideation was ignored and who hanged himself in his cell on December 17th, 2020, resulting in his untimely death.

## JURISDICTION AND VENUE

4.      This civil action is brought pursuant to 42 U.S.C. § 1981, et seq., and seeks monetary damages against Defendant for violations of 42 U.S.C. § 1983 and the Eighth and Fourteenth Amendments to the Constitution of the United States.

5.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), 1367(a), and 42 U.S.C. § 1983.

6.      The amount in controversy greatly exceeds this Court's jurisdictional requirements, excluding interest and costs.

7.      This Court has personal jurisdiction over Defendants, who are located in the Western District of Michigan.

2

8. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(b) and because all events and controversies occurred in this jurisdiction.

## PARTIES

9. Plaintiff, David Lovell, is the duly appointed personal representative of the estate of the decedent, Chase. Plaintiff is a resident of the City of Manton, Michigan.

10. Defendant, Kalamazoo County, is a political subdivision of the State of Michigan duly organized to carry out governmental functions pursuant to the laws of Michigan, one of the functions being to organize, operate, staff, and supervise its detention center known as the KCJ.

11. Defendant, Integrated Services of Kalamazoo, is a political subdivision of the State of Michigan duly organized to carry out governmental functions pursuant to the laws of Michigan.

12. At all times relevant to this Complaint, Defendant Lindsey O'Neil, was employed by the County of Kalamazoo as supervisor of the corrections recovery unit at Integrated Services of Kalamazoo, which includes the mental health program at KCJ. Upon information and belief, Defendant O'Neil is a resident within this district and is sued in her individual capacity.

13. At all times relevant to this Complaint, Defendant Deputy Thomas Jelsomeno, was employed by the County of Kalamazoo at KCJ. Upon information and belief, Defendant Jelsomeno is a resident within this district and is sued in his individual capacity.

3

14.     At all times relevant to this Complaint, Defendant Deputy Chris Zywicki, was employed by the County of Kalamazoo at KCJ. Upon information and belief, Defendant Zywicki is a resident within this district and is sued in his individual capacity.

15.     At all times relevant to this Complaint, Defendant Deputy Rebecca Dow, was employed by the County of Kalamazoo at KCJ. Upon information and belief, Defendant Dow is a resident within this district and is sued in her individual capacity.

16.     At all times relevant to this Complaint, Defendant Deputy Brett Boven was employed by the County of Kalamazoo at KCJ. Upon information and belief, Defendant Dow is a resident within this district and is sued in her individual capacity.

17.     At all times relevant to this Complaint, Defendant Sergeant Heather Mitcavish was employed by the County of Kalamazoo at KCJ. Upon information and belief, Defendant Mitcavish is a resident within this district and is sued in her individual capacity.

## **FACTUAL ALLEGATIONS**

18.     On December 11, 2020, Chase Lovell was brought to the inpatient psychiatry unit of Ascension Borgess Hospital in Kalamazoo, Michigan, by his mother after expressing suicidal ideations and sharing that he wanted to die.

19.     Chase's mother took him to Ascension Borgess Hospital because Chase walked off his job, was very depressed, showed symptoms of hearing things, was paranoid, was withdrawn, and he wanted to be left alone to kill himself.

20.     Chase voluntarily admitted himself to the facility in hopes of "making it stop."

4

21.     Chase has a pervasive history of mental health issues, previous suicide attempts, and self-harm behaviors.

22.     Chase was previously admitted to Ascension Borgess Hospital for suicidal ideations five months earlier—July 2020.

23.     On December 15, 2020, while receiving treatment at the hospital, Chase was accused of starting a fire, was arrested for arson, and taken to the KCJ.

24.     When David Lovell found out his son was taken from the hospital to jail, David called KCJ to inform them of Chase's suicidal ideations and expressed his concerns. KCJ assured David that Chase would be fine.

25.     On December 15, 2020, Defendant Lindsey O'Neil from Integrated Services of Kalamazoo consulted with a nurse from Ascension Borgess Hospital regarding Chase's medical status, including as it relates to his medical records and medications.

26.     Defendant Lindsey O'Neil learned that Chase was being treated for alcohol withdrawal and that he had a history of psychiatric hospitalizations and suicide attempts.

27.     Based on Chase's extensive history that indicated he was at risk of harm to himself, Chase was placed in a medical padded cell at KCJ upon his arrival on December 15, 2020.

28.     Chase was also placed in a suicide prevention gown.

29.     Upon information and belief, because of Chase's extensive history of mental illness and suicide risk, it was a requirement that a sign be posted on his cell informing staff of his risk and it was a requirement that he always be monitored via camera.

30.     The next day, on December 16, 2020, Defendant Lindsey O'Neil completed an initial screening and assessment on Chase.

31.     Chase appeared disheveled and had intermittent eye contact throughout the assessment.

32.     Chase informed Defendant O'Neil that he was "having a lot of voices," and the voices were "intermittent."

33.     Chase allegedly informed Defendant O'Neil that he was not feeling suicidal at the time of the screening.

34.     Defendant O'Neil, despite being informed that the voices affecting Chase were "intermittent," relied on Chase's statement that he was not feeling suicidal at the time of the screening to recommend Chase be moved out of the medical padded cell and out of the suicide prevention gown.

35.     Defendant O'Neil made the recommendation even though Chase was being treated at a hospital just one day prior for suicidal ideations.

36.     After the screening was completed, Defendant Zywicki and another officer moved Chase from the medical padded cell to a medical cell (M111).

37.     Defendant Zywicki recognized that it was a quick clearance for Chase, considering his history but nonetheless moved Chase out of the medical padded cell and into the medical cell (M111).

38.     Even though Chase reported not being suicidal during his screening with Defendant O'Neil, Captain Amy Price remained concerned about Chase's suicide-risk.

6

39.     Captain Amy Price required that Chase be placed in the medical cell with a suicide prevention blanket.

40.     Additionally, it remained a requirement that Chase be consistently monitored via camera.

41.     Defendant O'Neil also noted that Chase was to be rescreened throughout his time in the M111 cell.

42.     Inconsistent with Captain Price's continued concern about Chase's suicide risk, and at the alleged direction of Defendant Sergeant Mitcavish, Defendant Zywicki placed sheets and towels in Chase's M111 cell.

43.     Sheets and towels are not to be provided to an inmate who is at risk of suicide.

44.     Chase remained in the secluded M111 cell until he was found unresponsive at approximately 6:33 PM on December 17, 2020, after hanging himself using a bed sheet.

45.     On the morning of December 17, 2020, prior to the suicide, Chase made two different calls.

46.     On one call, Chase informed the person on call that the "voices are still bad."

47.     On the second call, Chase again stated that he was still hearing voices and that the "voices are just bad."

48.     Yet, despite Defendant O'Neil's requirement that Chase be rescreened throughout his time in the M111 cell, Defendant O'Neil nor any other qualified medical professional rescreened Chase on December 17, 2020.

49.     Further, on December 17, 2020, prior to the suicide, Defendants Rebecca Dow, Brett Boven, and Thomas Jelsomeno failed to conduct proper safety and security rounds to check on Chase, as was required by policy.

50.     Upon information and belief, Defendants Rebecca Dow, Brett Boven, and Thomas Jelsomeno were all working a shift at KCJ when Chase committed suicide on December 17, 2020.

51.     Defendants Dow, Boven, and Jelsomeno were each responsible for conducting rounds and checks on inmates, including Chase, in a timely manner in accordance with the policies of KCJ.

52.     The jail's policy was to check on inmates every 30 minutes, but on December 17, 2020, contrary to policy, Defendants failed to do so as required.

53.     Upon information and belief, the last interaction that any of the Defendants had with Chase on December 17, 2020, occurred at approximately 4:57 PM when he handed his dinner tray back to Defendant Dow.

54.     Between the times of approximately 4:57 PM and 6:33 PM on December 17, 2020, while Defendants improperly left Chase alone, Chase used the bed sheets to commit suicide.

55.     Notably, Chase's actions are caught on video—the same video that was put in place as a measure to maintain constant supervision over Chase and to allow for quick intervention if such an act occurred.

56. Although Chase is last seen on camera at approximately 5:09 PM, none of the KCJ staff check on Chase until approximately 6:33 PM—one hour and twenty minutes later—when Chase is found dead.

57. Despite Defendants' knowledge of Chase's high risk of suicide and suicidal history, they failed to adequately address the risk or take steps to provide adequate treatment, increasing the likelihood that he would commit suicide.

58. Defendants in fact exacerbated Chase's mental health conditions by the mistreatment and disregard for his condition.

59. Chase exhibited clear intent to engage in self harm and Defendants, despite their clear knowledge of his high risk for such actions, failed to take steps to prevent the injury, including but not limited to removing material that was readily available for executing the harm, keeping him in medical padded cell, conducting safety and security checks on a regular and timely basis per policy, or taking other appropriate steps to prevent the harm.

60. Chase's documented history of suicidal behavior from his medical screening and his extensive medical records obtained by KCJ; his admission to a hospital for suicidal ideations—the very place that he was arrested from; his report to KCJ staff of hearing intermittent voices in his head; his placement in a medical padded cell with a suicide prevention gown; his subsequent placement in a medical cell with a suicide prevention blanket; the placement of a sign on his cell notifying staff of his risk; and the constant-video monitoring of Chase's cell demonstrate that he had a serious medical need.

61.    Chase's psychological needs, which resulted in suicidal tendencies and his subsequent completed suicide, constituted a serious medical need. *See Troutman v. Louisville Metro. Dep't. Corr.*, 979 F.3d 472, 482 (6th Cir. 2020) ("Psychological needs may constitute such 'serious medical needs' particularly when those psychological needs 'result in suicidal tendencies.'") (quoting *Horn v. Madison Cty. Fiscal Ct.*, 22 F.3d 653, 660 (6th Cir. 1994)).

62.    Defendants' callous disregard of Chase's obvious pain and suffering rose to the level of reckless and intentional harm which was the cause of Chase's self-injurious behavior.

63.    Chase's death is a direct result of Defendants' explicit disregard of policy, gross negligence, and deliberate indifference to Chase's health and welfare.

### DEFENDANT LINDSEY O'NEIL

64.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

65.    Defendant O'Neil had a constitutional duty to protect Chase from violence and harm such as other officers, other inmates, and even himself.

66.    Defendant O'Neil worked at KCJ as supervisor of the corrections recovery unit, which includes the mental health program at KCJ.

67.    Defendant O'Neil evaluated and screened Chase on December 16, 2020— the day after Chase was arrested and removed from Ascension Borgess Hospital for alcohol withdrawal and suicidal ideations.

MARKO LAW

MARKO.LAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

68. Before meeting with Chase, Defendant O'Neil had contacted Ascension Borgess Hospital to obtain Chase's medical status, including as it related to his medical records and medications.

69. Because Defendant Lindsey O'Neil contacted Ascension Borgess Hospital, O'Neil knew that Chase was being treated for alcohol withdrawal and that he had a history of psychiatric hospitalizations and suicide attempts.

70. During the evaluation on December 16th, Chase informed Defendant O'Neil that he was having "intermittent" voices in his head.

71. Chase also told Defendant O'Neil that he was not feeling suicidal "*currently*" at the time of his evaluation with Defendant O'Neil.

72. Relying on Chase's statement that he was not feeling suicidal "*currently*" at the time of the evaluation, Defendant O'Neil recommended that Chase be removed from the medical padded cell and his suicide prevention gown.

73. Defendant O'Neil disregarded her knowledge of Chase's extensive mental health concerns, and his most recent admission for suicidal ideations, which occurred just four days prior.

74. Further, Defendant O'Neil noted in her recommendation that Chase be moved out of medical padded cell that he be rescreened and reevaluated throughout his time in the M111 cell.

75. However, upon information and belief, Defendant O'Neil, never rescreened or re-evaluated Chase.

76.     As a direct and proximate result of Defendant O'Neil's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was moved from the medical padded cell and removed from his suicide prevention gown—both of which are effective measures at preventing an inmate from committing suicide—and instead Chase was placed in a cell where he had access to means to commit suicide.

77.     As a direct and proximate result of Defendant O'Neil's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was never rescreened or reevaluated by Defendant O'Neil before he committed suicide.

78.     As a direct and proximate result of Defendant O'Neil's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase committed suicide in his cell on December 17, 2020.

79.     Had Defendant O'Neil rescreened and reevaluated Chase on December 17, 2020—the same date when Chase informed two individuals via phone calls that he was hearing voices and explained that the voices were bad—Defendant O'Neil would have learned that Chase was indeed at risk of committing suicide.

### DEFENDANT REBECCA DOW

80.     Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

81.     Defendant Dow had a constitutional duty to protect Chase from violence and harm such as other officers, other inmates, and even himself.

82.     Defendant Dow was responsible, through her employment at KCJ, for conducting regular safety and security checks on inmates, including Chase.

83. Defendant Dow was working a shift on December 17, 2020, at the time that Chase committed suicide.

84. Upon information and belief, Defendant Dow knew of Chase's suicide risk via the following means, including, but not limited to: the sign placed on his cell; Chase's placement in a medical padded cell in a suicide prevention gown upon his arrival to KCJ on December 15, 2020; Chase's placement in medical cell (M111) with a suicide prevention blanket; communication from Defendant Jelsomeno's superiors and co-workers; and other means to be discovered during litigation.

85. Upon information and belief, the last interaction Defendant Dow had with Chase was at approximately 4:57 PM when Chase handed back his dinner tray.

86. Upon information and belief, Defendant Dow's interaction with Chase at 4:57 PM was the last time that any Defendant or jail staff observed Chase alive.

87. Upon information and belief, Defendant Dow did not, nor did any other jail staff, conduct a safety and security check on Chase within the next 30 minutes—as required by jail policy.

88. Upon information and belief, Defendant Dow, nor any other jail staff, conducted a safety and security check on Chase until approximately 6:33 PM—more than 1.5 hours later.

89. As a direct and proximate result of Defendant Dow's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was unsupervised for more than 30 minutes.

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

90.     As a direct and proximate result of Defendant Dow's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was able to attempt and complete suicide in his cell on December 17, 2020.

91.     Had Defendant Dow conducted herself in accordance with the policies that required her to observe Chase every thirty minutes, Chase would still be alive today.

### DEFENDANT THOMAS JELSOMENO

92.     Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

93.     Defendant Jelsomeno had a constitutional duty to protect Chase from violence and harm such as other officers, other inmates, and even himself.

94.     Defendant Jelsomeno was responsible, through his employment at KCJ, for conducting regular safety and security checks on inmates, including Chase.

95.     Defendant Jelsomeno was working a shift on December 17, 2020, at the time that Chase committed suicide.

96.     Upon information and belief, Defendant Jelsomeno knew of Chase's suicide risk via the following means, including, but not limited to: the sign placed on his cell; Chase's placement in a medical padded cell in a suicide prevention gown upon his arrival to KCJ on December 15, 2020; Chase's placement in medical cell (M111) with a suicide prevention blanket; communication from Defendant Jelsomeno's superiors and co-workers; and other means to be discovered during litigation.

97.     Upon information and belief, the last interaction/safety and security check of Chase occurred at approximately 4:57 PM when Chase handed back his dinner tray to Defendant Dow.

98.     Upon information and belief, Defendant Dow's interaction with Chase at 4:57 PM was the last time that any Defendant or jail staff observed Chase alive.

99.     Upon information and belief, Defendant Jelsomeno did not, nor did any other jail staff, conduct a safety and security check on Chase within the next 30 minutes—as required by jail policy.

100.    Upon information and belief, Defendant Jelsomeno, nor any other jail staff, conducted a safety and security check on Chase until approximately 6:33 PM—more than 1.5 hours later.

101.    As a direct and proximate result of Defendant Jelsomeno's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was unsupervised for more than 30 minutes.

102.    As a direct and proximate result of Defendant Jelsomeno's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was able to attempt and complete suicide in his cell on December 17, 2020.

103.    Had Defendant Jelsomeno conducted himself in accordance with the policies that required him to observe Chase every thirty minutes, Chase would still be alive today.

**DEFENDANT BRETT BOVEN**

104.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

105.    Defendant Boven had a constitutional duty to protect Chase from violence and harm such as other officers, other inmates, and even himself.

106.    Defendant Boven was responsible, through his employment at KCJ, for conducting regular safety and security checks on inmates, including Chase.

107.    Defendant Boven was working a shift on December 17, 2020, at the time that Chase committed suicide.

108.    Upon information and belief, Defendant Boven knew of Chase's suicide risk via the following means, including, but not limited to: the sign placed on his cell; Chase's placement in a medical padded cell in a suicide prevention gown upon his arrival to KCJ on December 15, 2020; Chase's placement in medical cell (M111) with a suicide prevention blanket; communication from Defendant Jelsomeno's superiors and co-workers; and other means to be discovered during litigation.

109.    Upon information and belief, the last interaction/safety and security check of Chase occurred at approximately 4:57 PM when Chase handed back his dinner tray to Defendant Dow.

110.    Upon information and belief, Defendant Boven's interaction with Chase at 4:57 PM was the last time that any Defendant or jail staff observed Chase alive.

111.    Upon information and belief, Defendant Boven did not, nor did any other jail staff, conduct a safety and security check on Chase within the next 30 minutes—as required by jail policy.

112.    Upon information and belief, Defendant Boven, nor any other jail staff, conducted a safety and security check on Chase until approximately 6:33 PM—more than 1.5 hours later.

113.    As a direct and proximate result of Defendant Boven's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was unsupervised for more than 30 minutes.

114.    As a direct and proximate result of Defendant Boven's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was able to attempt and complete suicide in his cell on December 17, 2020.

115.    Had Defendant Boven conducted himself in accordance with the policies that required him to observe Chase every thirty minutes, Chase would still be alive today.

## DEFENDANT HEATHER MITCAVISH

116.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

117.    Defendant Mitcavish had a constitutional duty to protect Chase from violence and harm such as other officers, other inmates, and even himself.

118.    Upon information and belief, Defendant Mitcavish knew of Chase's suicide risk via the following means, including, but not limited to: the sign placed on his cell; Chase's placement in a medical padded cell in a suicide prevention gown upon his arrival to KCJ on December 15, 2020; Chase's placement in medical cell (M111) with a suicide prevention blanket; communication from Defendant Mitcavish's superiors and co-workers, including Jon Klok who notified Defendant Mitcavish that Chase was at risk of suicide

before being moved to the medical cell (M111); and other means to be discovered during litigation.

119. Upon information and belief, Defendant Mitcavish disregarded Chase's known risk for suicidal ideations and mental illness by ordering Defendant Zywicki to place towels and bed sheets in Chase's medical cell (M111).

120. Further, Defendant Mitcavish's decision to give towels and bed sheets to Chase disregarded Captain Amy Price's order that Chase be placed in the medical cell with a green suicide prevention blanket out of clear concern for his suicidal ideations.

121. As a direct and proximate result of Defendant Mitcavish's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was provided materials (towels and bed sheets) that are prohibited from being provided to an inmate who is known to have suicidal ideations.

122. As a direct and proximate result of Defendant Mitcavish's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was able to attempt and complete suicide in his cell on December 17, 2020, using the bed sheets provided to him.

**DEFENDANT CHRIS ZYWICKI**

123. Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

124. Defendant Zywicki had a constitutional duty to protect Chase from violence and harm such as other officers, other inmates, and even himself.

125.   Upon information and belief, Defendant Zywicki knew of Chase's suicide risk via the following means, including, but not limited to: the sign placed on his cell; Chase's placement in a medical padded cell in a suicide prevention gown upon his arrival to KCJ on December 15, 2020; Defendant Zywicki's relocation of Chase from the medical padded cell to a medical cell (M111) with a suicide prevention blanket; communication from Defendant Zywicki's superiors and co-workers, including Defendant Mitcavish; and other means to be discovered during litigation.

126.   Upon information and belief, Defendant Zywicki disregarded Chase's known risk for suicidal ideations and mental illness by placing towels and bed sheets in Chase's medical cell (M111).

127.   Further, Defendant Zywicki's decision to give towels and bed sheets to Chase disregarded Captain Amy Price's order that Chase be placed in the medical cell with a green suicide prevention blanket out of clear concern for his suicidal ideations.

128.   As a direct and proximate result of Defendant Zywicki's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was provided materials (towels and bed sheets) that are prohibited from being provided to an inmate who is known to have suicidal ideations.

129.   As a direct and proximate result of Defendant Zywicki's deliberate indifference to Chase's constitutional rights, as set forth herein, Chase was able to attempt and complete suicide in his cell on December 17, 2020 using the bed sheets provided to him.

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

## <u>COUNT I - 42 U.S.C. § 1983 CONSTITUTIONAL DEPRIVATIONS</u>
### (Against Individual Defendants)

130.   Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

131.   Defendant is a person within the meaning of the term under 42 U.S.C. § 1983.

132.   Plaintiff decedent, Chase, was entitled to constitutionally protected rights as a citizen of the United States of America, such as a right to personal safety and right to medical care and protection encompassed in the substantive component of the Due Process Clause of the Fourteenth Amendment.

133.   As an incarcerated prisoner in KCJ, Plaintiff decedent was also owed rights under the Eighth Amendment ensuring protection from cruel and unusual punishment, including the right to have reasonable measures taken to guarantee his safety and to treat his serious medical needs.

134.   Defendant, as Plaintiff decedent's custodial caretaker, owed Plaintiff decedent an affirmative duty to secure for him the constitutionally protected rights identified above.

135.   Defendant, knowing Plaintiff decedent's medical needs, had a duty under state law, to instruct, supervise, train, direct, and conduct themselves and/or their employees to assure the delivery of medical care and supervision to Plaintiff decedent that is consistent with his health and safety, and which avoided the unreasonable risk of severe harm to him.

136. The acts and omissions attributable to the Defendants under 42 U.S.C. § 1983 were unreasonable and performed knowingly, deliberately, intentionally, maliciously, with gross negligence, callousness, and reckless indifference to Plaintiff's well-being and in complete disregard of Plaintiff's safety, with wanton intent for Plaintiff to suffer the unnecessary and intentional infliction of pain, failure to obtain timely medical treatment, and failure to properly train, supervise, develop and implement policies providing adequate medical and psychiatric treatment to a prisoner and by reason of which Plaintiff is entitled to compensatory and punitive damages.

137. The conduct of the Defendant deprived Plaintiff decedent, Chase Lovell, of his clearly established rights, privileges, and immunities in violation of the Fourth, Eighth and Fourteenth Amendments of the United States Constitution and of 42 U.S.C. § 1983.

138. Defendant's conduct exhibited a deliberate indifference by intentional acts and omissions and otherwise grossly negligent behavior so as to breach Plaintiff decedent's right to basic safety and causing constitutional deprivation of his individual rights.

139. Defendant not only breached this duty but also acted, under color of law, with gross negligence and deliberate indifference to Plaintiff decedent's safety, protection, and medical needs by:

- Failing to properly render the proper medical attention to a prisoner who was diagnosed and generally recognized as mentally ill;

- Failing to properly train correction officers in the evaluation of whether a prisoner needs medical treatment;

- Failing to provide decedent with appropriate supervision given his medical needs and suicidal ideation;

- Failing to properly address Plaintiff decedent's immediate suicide risk, recklessly disregarding decedent's suicidal history, and decedent's health and safety;

- Failing to promptly respond to Plaintiff decedent's recognizable medical emergency in reckless disregard and deliberate indifference to decedent's health and safety;

- Failing to place Plaintiff decedent in a safe environment so that he could not harm himself or others;

- Failing to properly supervise Plaintiff decedent throughout the afternoon/evening of December 17, 2020, knowing the risk decedent posed to himself;

- Failing to act in other ways that exposed Plaintiff decedent to a known, extreme risk to his health and safety that may or will become known during discovery.

140.   As a direct and proximate result of the aforementioned conduct and omissions of Defendant, Plaintiff decedent, Chase Lovell, was deprived of his constitutionally protected rights as described above and suffered severe and permanent brain injuries, pain and suffering, medical bills and costs, economic damages, and the prisoner's death.

WHEREFORE, Plaintiff requests the following relief:

- Extreme pain and suffering and mental health and emotional damages resulting from Defendants' acts and omissions up to and including his death;

- Loss of comfort, society, and companionship;

- Reasonable medical, funeral, and burial expenses;

- Compensatory and punitive damages;

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

- All damages allowed under the Wrongful Death Act including economic damages and loss of society and companionship; and

- Any and all other damages otherwise recoverable under 42 U.S.C. §§ 1983 and 1988, including an award of attorney fees and costs.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant, including punitive damages under 42 U.S.C. § 42, in excess of $75,000.00 together with interest, costs and attorney's fees.

## COUNT II - *MONELL* CLAIM

(As to Defendant County of Kalamazoo & Defendant Integrated Services of Kalamazoo)

141. Plaintiff hereby re-alleges each and every allegation contained in paragraphs 1 through 45 of this Complaint as if fully stated herein.

142. Pursuant to 42 U.S.C. § 1983, as well as the Fourth and Fourteenth Amendments to the United States Constitution, Defendant owed Chase certain duties to properly supervise, monitor and train its correctional officers and staff so as to monitor and supervise the jail's prisoners so that they would detect serious medical conditions and facilitate prompt and immediate medical attention and/or transport to a hospital ER.

143. That Defendant, in its representative and official capacity, has maintained a custom and policy of improper training and supervision of its jail employees. Defendant is not protected by governmental immunity when following a policy that deprives individuals of their constitutional rights. *Monell v N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 692 (1978).

144. Defendant owed Chase the following duties and obligations:

- To use due care and caution;

- To adequately and properly create and promulgate guidelines and policies that comply with the requirements of 42 U.S.C. § 1983 regarding the incarceration of prisoners and the supervision of prisoners, especially those who are mentally and emotionally and physically unstable and especially those who are diagnosed as having psychiatric or psychological problems;

- To adequately and properly create and promulgate guidelines and policies that comply with the requirements of 42 U.S.C. § 1983 regarding the incarceration of prisoners who have threatened self-injury or suicide to ensure that staff can immediately and appropriately respond and act when a prisoner is in distress and has threatened self-injury or suicide;

- To adequately and properly train and supervise correction officers and employees of the KCJ under Defendant's supervision on the proper method of supervising prisoners and providing for their medical needs and on effectively controlling prisoners who have or are suspected to have psychological or psychiatric problems; and

- To avoid hiring or selecting individuals who Defendant knows or should know are incapable of performing their responsibilities or who are likely to misuse or abuse the power conferred on them as employees of the BCJ.

145.  Defendant breached these duties via its policies, procedures, regulations, customs and/or lack of training and thus exhibited a reckless indifference toward its prisoners, and Chase Lovell specifically, in the following ways, including but not limited to:

- Defendant's failure to staff the jail with competent medical personnel;

- Defendant's failure to monitor their correctional officers and medical personnel to ensure that they adequately monitor and supervise prisoners who have serious medical needs;

- Defendant's failure to have proper policies and procedures, and training to deal with suicidal prisoners and ensure that the policies and/or procedures are followed, which include serial examinations by

MARKOLAW.COM

1300 BROADWAY ST. | 5TH FLOOR
DETROIT, MI 48226

P: (313) 777-7LAW
F: (313) 771-5785

MARKO LAW

competent and licensed medical and mental health personnel like RNs, Psychologists and/or Doctors as well as its failure to ensure the correctional officers conduct timely and adequate rounds and record their observations of the prisoners every 30 minutes as required by their own policies and/or procedures;

- Defendant's failure to require that an RN, Doctor, or Mental Health Professional perform a full and complete examination of a suicidal prisoner, secluded in an isolated cell, at least once per day;

- Defendant's failure to have proper policies and procedures, and training to deal with prisoners who have threatened self-injury or suicide to insure that KCJ staff personnel can immediately and appropriately respond and act when a prisoner is distress and has threatened self-injury or suicide;

- Defendant's failure to fully investigate and discipline its correctional officers and/or medical/mental health personnel who do not abide by policies and procedures relative to providing medical care for serious conditions; and,

- All other breaches learned through the course of discovery.

146.   Defendant trained its KCJ officials and/or employees and agents in such a reckless and grossly negligent matter, that it was inevitable that the officials would place a suicidal prisoner in a place where he would not be supervised when it was obvious that such a prisoner needed constant supervision. Notwithstanding Chase's contemplation of suicide and request for help, Defendant repeated and acquiesced in the continued practice of not placing potentially suicidal prisoners, such as Chase, under close supervision and acquiesced in the repeated and continued practice of not adequately treating suicidal prisoners in obvious need of treatment.

147.    The failure of the Defendant to provide training and supervision regarding the prevention of suicides amounts to deliberate indifference to the safety and lives of the prisoners of the KCJ and particularly Chase Lovell.

148.    Defendant knew or in the exercise of reasonable care should have known that individual jail officials had engaged in misconduct and other violations of the constitutional rights of prison prisoners at the KCJ, more specifically of Chase.

149.    Defendant failed to properly investigate the improper practices and to supervise and train the jail officials at the KCJ.

150.    As a direct and proximate result of the above cited violations of Plaintiff's civil rights by Defendants, Chase died and thus his estate, through David Lovell, has and will continue to suffer damages in the future, including, but not limited to:

- Reasonable funeral and burial expenses;

- Reasonable compensation for the pain and suffering undergone by Chaseh while he was conscious during the time between his first psychiatric symptoms and his death;

- Loss of comfort, society, and companionship;

- Compensatory and punitive damages; and

- Any and all other damages otherwise recoverable under USC Section 1983 and Section 1988.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendant, including punitive damages under 42 U.S.C. § 42, in excess of $75,000.00 together with interest, costs and attorney's fees.

## COUNT III

**AMERICANS WITH DISABILITIES ACT (ADA) VIOLATION – FAILURE TO ACCOMMODATE – County of Kalamazoo & Integrated Services of Kalamazoo**

151.    Plaintiff hereby incorporates by reference the preceding paragraphs as though fully stated herein.

152.    At all times relevant hereto, Plaintiff decedent, Chase, was an individual and Defendant's jail was a public service within the meaning of the Americans with Disabilities Act ("ADA"), being 42 USC §12131, et seq.

153.    At all times relevant hereto, Chase was a person with a disability in accordance with the ADA.

154.    Chase was an individual with a disability in accordance with the ADA, in that he had a mental impairment that substantially limited one or more of his major life activities.

155.    Chase's disability was a major depressive disorder, suicidal ideation, and other psychological disorders.

156.    At all times relevant hereto, Defendant had a duty under the ADA to accommodate Chase unless the accommodation would impose an undue hardship. Defendants' duty to accommodate Chase includes, but is not limited to, providing him with ongoing adequate medical and mental health care, and when he threatened to commit suicide, transferring him to a safe location and properly supervising and monitoring him.

157.    At all times relevant hereto, Defendant could have accommodated Chase's disability without suffering an undue hardship.

27

158. As a direct and proximate result of Defendant's disability discrimination, Chase has suffered mental anguish, emotional distress, outrage, fear of impending death, death, and all other damages or consequences related to the incidents set forth above.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants, for whatever sum he is found to be entitled to together with costs, interest, attorney fees, and punitive and/or exemplary damages.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff, David Lovell, as Personal Representative of the Estate of Chase Lovell, deceased, respectfully requests this Honorable Court to enter judgment in his favor and against Defendants, for whatever sum he is found to be entitled together with costs, interest, and attorney fees.

Respectfully submitted,


/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
1300 Broadway Street, Fifth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 777-5785
Email: jon@markolaw.com

Date: June 20, 2022

## <u>DEMAND FOR TRIAL BY JURY</u>

NOW COMES Plaintiff, David Lovell, as personal representative of the Estate of

Chase Lovell, deceased, by and through his attorneys, **MARKO LAW, PLLC**, and hereby

demands a trial by jury in the above-captioned matter.

Respectfully submitted,

/s/ *Jonathan R. Marko*
Jonathan R. Marko (P72450)
**MARKO LAW, PLLC**
1300 Broadway Street, Fifth Floor
Detroit, MI 48226
(313) 777-7529 / Fax: (313) 777-5785
Email: jon@markolaw.com

Date:  June 20, 2022