UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID LOVELL,
Personal Representative of the
Estate of Chase Lovell

              Plaintiff,

v.

KALAMAZOO COUNTY,
*et al.*,

              Defendants.

_____/

Case No. 1:22-cv-567

Hon. JANE M. BECKERING

## REPORT AND RECOMMENDATION

Chase Lovell (sometimes referred to as "Mr. Lovell") died while he was a pre-trial detainee at the Kalamazoo County Jail ("Jail"). David Lovell, personal representative of the Estate of Chase Lovell, deceased ("plaintiff") filed this lawsuit against eight defendants. One group of defendants (the "County defendants") consists of Kalamazoo County (the "County") and its employees Deputy Thomas Jelsomeno, Deputy Chris Zywicki, Deputy Rebecca Dow, Deputy Brett Boven, and Sgt. Heather Mitcavish. Compl. (ECF No. 1, PageID.3-4). The other group of defendants (the "ISK deendants") consists of Integrated Services of Kalamazoo ("ISK") and Lindsey O'Neil (supervisor of the corrections recovery unit at ISK, which includes a mental health program at the Jail). *Id.* at PageID.3. Plaintiff has sued defendants Jelsomeno, Zywicki, Dow, Boven, Mitcavish, and O'Neil in their individual capacities. *Id.* at PageID.3-4. This matter is now before the Court on motions for summary judgment filed by the ISK defendants (ECF No. 84) and the County defendants (ECF No. 88).

1

I.    **Complaint**

Plaintiff's allegations are summarized as follows.  On December 11, 2020, Mr. Lovell was brought to the inpatient psychiatry unit of Ascension Borgess Hospital in Kalamazoo, Michigan, by his mother after expressing suicidal ideations and sharing that he wanted to die. Compl. at PageID.4.

On December 15, 2020, while receiving treatment at the hospital, Mr. Lovell was accused of starting a fire, arrested for arson, and taken to the Jail.  *Id*. at PageID.5.  Ms. O'Neil learned that Mr. Lovell was being treated for alcohol withdrawal and that he had a history of psychiatric hospitalizations and suicide attempts.  *Id*.  Based on this history, which indicated he was at risk of harm to himself, Mr. Lovell was placed in a medical padded cell (sometimes referred to as an "MPAD cell").  *Id*.

On December 16, 2020, Ms. O'Neil screened Mr. Lovell.  At that time, Lovell told O'Neil that he was "having a lot of voices" and that the voices were "intermittent." *Id*. at PageID.6. However, Lovell also told O'Neil that he was not feeling suicidal. *Id*.  Ms. O'Neil relied on Lovell's statement that he was not feeling suicidal at the time of the screening to recommend that he be moved out of the medical padded cell and out of the suicide prevention gown.  *Id*.

After the screening, Deputy Zywicki and another officer moved Mr. Lovell from the medical padded cell to a medical cell (M111).  *Id*.  Zywicki recognized that it was a quick clearance for Chase, considering his history but nonetheless moved him.  *Id*.  Non-party Capt. Amy Price remained concerned that Mr. Lovell was a suicide risk and required that he be placed in a medical cell with a suicide prevention blanket.  *Id*. at PageID.7.  It remained a requirement that he be consistently monitored via camera.  *Id*.

2

Inconsistent with Capt. Price's concern about Mr. Lovell's suicide risk, and at the alleged direction of Sgt. Mitcavish, Deputy Zywicki placed sheets and towels in Mr. Lovell's M111 cell.  *Id.* at PageID.7.  Sheets and towels are not to be provided to an inmate who is at risk of suicide.  *Id.*

Mr. Lovell committed suicide on the evening of December 17, 2020.  Neither O'Neil nor any other qualified medical professional rescreened Mr. Lovell on that date. *Id.*  The last interaction defendants had with Lovell occurred at approximately 4:57 p.m. when he handed his dinner tray back to Deputy Dow.  *Id.*  Prior to the suicide, Deputies Dow, Boven, and Jelsomeno failed to conduct proper safety and security rounds to check on Lovell every 30 minutes as required by policy.  *Id.* at PageID.8. Between approximately 4:57 p.m. and 6:33 p.m., while the three deputies improperly left Lovell alone, he used the bed sheets to commit suicide.  *Id.*  Although Lovell is last seen on camera at approximately 5:09 p.m., none of the Jail staff checked on him until approximately 6:33 p.m., one hour and twenty minutes later, when he was found dead.  *Id.* at PageID.9.

Plaintiff's complaint sets forth three counts.  In Count I ("42 U.S.C. §1983 constitutional deprivations"), plaintiff claims that the individual defendants were deliberately indifferent to Mr. Lovell's safety, protection and medical needs in violation of the Fourteenth Amendment.  *Id.* at PageID.20-23.[1]  Plaintiff's requested relief includes damages and attorney's fees.  *Id.* at PageID.23.

In Count II ("*Monell* claim"), plaintiff claims that defendants County and ISK failed to supervise, monitor and train its correctional staff in violation of 42 U.S.C. § 1983 and the

---

[1] While plaintiff also alleged that defendants violated his Eighth Amendment rights, his claims arose under the Fourteenth Amendment. *See* discussion, *infra*.

3

Fourteenth Amendment.  *Id*. at PageID.23-26.[2]  Plaintiff's requested relief includes damages and attorney's fees.  *Id*. at PageID.26.

In Count III ("Americans with Disabilities Act (ADA) [42 USC §12131, *et seq.*] Violation – failure to accommodate – County of Kalamazoo & Integrated Services of Kalamazoo"), plaintiff claims that the County and ISK failed to accommodate Mr. Lovell's depressive disorder, suicidal ideation, and other psychological disorders in violation of the ADA *Id*. at PageID.27-28.  For his relief, plaintiff seeks a judgment in "whatever sum he is found to be entitled to" together with attorney fees and punitive and/or exemplary damages.  *Id*. at PageID.28.

## II.    Ms. O'Neil's motion for summary judgment

### A.    Legal standard

Defendants seek summary judgment on plaintiff's claims pursuant to Fed. R. Civ. P. 56(a).  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 further provides that a party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

---

[2] While plaintiff also alleged a claim under the Fourth Amendment, his claim arose under the Fourteenth Amendment. *See* discussion, *infra*.

In *Copeland v. Machulis*, 57 F.3d 476 (6th Cir. 1995), the court set forth the parties' burden of proof in a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d at 478-79 (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

## B.    Plaintiff's Fourteenth Amendment claim

Plaintiff seeks relief pursuant to 42 U.S.C. § 1983, which "provides a civil cause of action for individuals who are deprived of any rights, privileges, or immunities secured by the Constitution or federal laws by those acting under color of state law."  *Smith v. City of Salem, Ohio*, 378 F.3d 566, 576 (6th Cir. 2004).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) that the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.

## C.    Discussion

Ms. O'Neil seeks summary judgment based on the affirmative defense of qualified immunity.  *See* ISK defendants' Brief (ECF No. 84, PageID.1338-1346).  Under this defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457

U.S. 800, 818 (1982).  "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted).  The doctrine of qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Carroll v. Carman*, 574 U.S. 13, 17 (2014).

The existence of qualified-immunity inquiry involves two questions: whether the defendant violated a constitutional right and whether that right was clearly established.  *See Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  "These questions may be answered in any order; if either one is answered in the negative, then qualified immunity protects the official from civil damages." *Brown v. Chapman*, 814 F.3d 447, 457 (6th Cir. 2016).  "On summary judgment, the court must analyze these questions after construing the facts in the light most favorable to the party asserting the injury and drawing all reasonable inferences in that party's favor." *Id*.  When a defendant raises a defense of qualified immunity, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity." *Livermore ex rel Rohm v. Lubelan*, 476 F.3d 397, 403 (6th Cir. 2007).

As a pre-trial detainee, Mr. Lovell's claim arises under the Fourteenth Amendment. *See Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) ("a pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987"). Ms. O'Neil contends that when Lovell committed suicide in 2020, the legal standard applicable to a pre-trial detainee's Fourteenth Amendment rights was set forth in *Farmer v. Brennan*, 511 U.S. 825 (1994), rather than the legal standard set forth in the more recent Sixth Circuit decisions in *Brawner v Scott County, Tennessee*, 14 F.4th 585 (6th Cir. 2021) and *Helphenstine v Lewis County*,

60 F.4th 305 (6th Cir. 2023).  In short, Ms. O'Neil points out that the *Brawner* and *Helphenstine*

decisions did not exist and did not apply.

In *Lawler as next friend of Lawler v. Hardeman County, Tennessee*, 93 F.4th 919

(6th Cir. 2024), the court explained the framework applicable to qualified immunity claims

involving a similar case, *i.e.*: a pre-trial detainee committed suicide in a county jail, the plaintiff

filed a civil rights lawsuit pursuant to 42 U.S.C. § 1983 alleging that the jail personnel violated the

decedent's Fourteenth Amendment rights, and the incident occurred before the Sixth Circuit

established a new legal standard for Fourteenth Amendment claims related to treatment of medical

conditions in the *Brawner* decision.  In *Lawler*, the Sixth Circuit concluded that the *Farmer*

standard applied to the claim which arose in 2018:

> Qualified immunity shields public officials from the time and expense of a trial unless their actions infringed "clearly established" rules that a "reasonable person" would have understood.  *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5, 142 S.Ct. 4, 211 L.Ed.2d 164 (2021) (per curiam) (quoting *White v. Pauly*, 580 U.S. 73, 78-79, 137 S.Ct. 548, 196 L.Ed.2d 463 (2017) (per curiam)).  This immunity seeks to give officials "fair notice" about when their actions will subject them to liability. *Id.*; *see Kisela v. Hughes*, 584 U.S. 100, 138 S. Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam).  And officers will obviously lack notice of future rules that a court has yet to adopt. So courts evaluating a qualified-immunity defense may consider only the legal rules existing when "the challenged conduct" occurred, not legal rules adopted by later caselaw.  *Ashcroft v. al-Kidd*, 563 U.S. 731, 741, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *see Kenjoh Outdoor, LLC v. Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022); *Hansen v. Aper*, 746 F. App'x 511, 517 n.3 (6th Cir. 2018).

> Under this framework, we must identify the rules that governed in July 2018 when [the pre-trial detainee] took his life.  This inquiry starts by identifying the constitutional right at issue.  Lawler was a pretrial detainee at the time of his death, meaning that a court had yet to try or punish him.  [The plaintiff] thus cannot invoke the Eighth Amendment right against "cruel and unusual punishments" because that right kicks in only after a conviction.  U.S. Const. amend. VIII; *see Bell v. Wolfish*, 441 U.S. 520, 535 n.16, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  Still, pretrial detainees like Lawler do have a Fourteenth Amendment right not to be "deprive[d]" of their "life" "without due process of law."  U.S. Const. amend. XIV, § 1. And the Supreme Court has long held that the Due Process Clause offers protections to

pretrial detainees that at least match those afforded convicted prisoners under the Eighth Amendment.  *See County of Sacramento v. Lewis*, 523 U.S. 833, 849-50, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998).

Having identified the right, we next must identify the claim at issue.  This case implicates the legal rules that apply to claims that jail staff violated the Due Process Clause by failing to protect pretrial detainees from harm.  These types of claims can arise in a variety of circumstances.  Sometimes, a correctional officer might fail to protect the detainee from violence by other inmates.  *Cf. Farmer v. Brennan*, 511 U.S. 825, 830, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  Other times, a prison doctor might fail to treat the detainee for a harmful medical condition.  *Cf. Estelle v. Gamble*, 429 U.S. 97, 102-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  At still other times, jail staff might fail to thwart a detainee's suicide.  *Cf. Downard ex rel. Downard v. Martin*, 968 F.3d 594, 598-99 (6th Cir. 2020).

In the Eighth Amendment context, the Supreme Court has held that the failure to protect prisoners from harm violates the ban on cruel and unusual punishment only if the prisoners prove both objective and subjective elements.  *See Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. Objectively, prisoners must have faced a "substantial risk of serious harm."  *Id*.  Subjectively, officers must have acted with "deliberate indifference" to this risk.  *Id*.  Under this test, an inmate must prove both that an officer subjectively knew of facts that created a substantial risk of serious harm to the inmate and that the officer subjectively concluded that this risk existed.  *Id*. at 837, 114 S.Ct. 1970.  Because officers must consciously know of the risk, then, they do not violate the Eighth Amendment merely by negligently or recklessly overlooking it.  *Id*. at 837-38, 114 S.Ct. 1970.

Should these Eighth Amendment rules for failure-to-protect claims by prisoners extend to similar claims by pretrial detainees under the Due Process Clause?  For years, we answered "yes" to this question [citations omitted].

But the ground underlying our traditional approach began to shift in 2015 when the Supreme Court decided *Kingsley v. Hendrickson*, 576 U.S. 389, 135 S.Ct. 2466, 192 L.Ed.2d 416 (2015).  That case concerned an excessive-force claim (not a failure-to-protect claim).  *See id*. at 392-93, 135 S.Ct. 2466.  In the Eighth Amendment context, excessive-force claims also have objective and subjective components.  *See Johnson v. Sootsman*, 79 F.4th 608, 615-16 (6th Cir. 2023).  But the subjective element demands more than deliberate indifference.  A correctional officer's use of force against a prisoner violates the Eighth Amendment only if the officer acted "maliciously and sadistically to cause harm."  *Id*. at 616 (quoting *Wilkins v. Gaddy*, 559 U.S. 34, 37, 130 S.Ct. 1175, 175 L.Ed.2d 995 (2010) (per curiam)).  In *Kingsley*, the Court refused to extend this demanding Eighth Amendment test to a pretrial detainee's excessive-force claim.  576 U.S. at 400-02, 135 S.Ct. 2466.  The Court instead held that the Due Process Clause required

pretrial detainees to show only that the force "was objectively unreasonable." *Id*.
at 397, 135 S.Ct. 2466.

In the ensuing years, circuit courts disagreed over whether *Kingsley*'s
decision to jettison the Eighth Amendment's subjective element for a pretrial
detainee's excessive-force claim also modified the subjective element for a pretrial
detainee's failure-to-protect claim. *See Beck*, 969 F.3d at 601. In 2021, we sided
with the courts that extended *Kingsley* to this failure-to-protect context. *See
Brawner v. Scott County*, 14 F.4th 585, 591-97 (6th Cir. 2021). After initial
disagreement over what *Brawner* required, we settled on a test that reduced
*Farmer*'s subjective element from "actual knowledge to recklessness."
*Helphenstine v. Lewis County*, 60 F.4th 305, 316 (6th Cir. 2023); *cf. Trozzi v. Lake
County*, 29 F.4th 745, 757-58 (6th Cir. 2022). Today, officers can face liability
even if they did not actually know of a risk of harm to a pretrial detainee. Pretrial
detainees need only prove that the officers recklessly disregarded a risk so obvious
that they either knew or should have known of it. *See Helphenstine*, 60 F.4th at
317.

What do these recent legal changes mean for the claims here? The changes
do not affect our resolution because [the plaintiff] must overcome qualified
immunity's "clearly established" prong. Our recent cases that depart from *Farmer*
in this pretrial-detainee context came out between 2021 and 2023. Because they
postdate [the pre-trial detainee's] suicide, they do not clearly establish anything "at
the time" the Officers acted. *Kenjoh Outdoor*, 23 F.4th at 694. Admittedly, the
Supreme Court decided *Kingsley* before [the pre-trial detainee] took his life. But
*Kingsley*, a decision about excessive force, did not clearly apply to this failure-to-
protect context. The circuit split about *Kingsley*'s scope confirms this point. *See
Beck*, 969 F.3d at 601. In short, our older decisions applying *Farmer* to the claims
of pretrial detainees provide the only clearly established law in 2018.

This difference matters. To be sure, the district court suggested that it need
not decide whether *Brawner* modified *Farmer* because [the plaintiff] had created a
genuine dispute of fact even under *Farmer*'s more demanding test. *See Lawler* [*v.
Hardeman County, Tennessee*, No. 119CV01174STATMP, 2022 WL 4587171 at
*4-5 (W.D. Tenn. Sept. 29, 2022)]. But the court actually invoked *Brawner*'s more
lenient test in all but name when applying the law to the facts. It reasoned that a
jury could find that the Officers had "*recklessly* disregarded" a significant risk that
[the pre-trial detainee] would take his life. *Id*. at *5-6 (emphasis added). *Farmer*,
however, requires the Officers to have "*consciously*" (not recklessly) disregarded
that risk. 511 U.S. at 839, 114 S.Ct. 1970 (emphasis added). That is, they must have
"draw[n] the inference" that the risk existed. *Id*. at 837, 114 S.Ct. 1970. . .

*Lawler*, 93 F.4th at 926-928.

For the reasons discussed in *Lawler*, this Court will apply the standard set forth in *Farmer*, 511 U.S. 825. The next question is determining the elements of a Fourteenth Amendment claim in the context of a pre-trial detainee who commits suicide. In *Lawler*, the Sixth Circuit set forth a comprehensive discussion of how courts should evaluate the objective element and the subjective element in Fourteenth Amendment claims involving jail suicides.

*Objective Element. Farmer*'s objective element generally requires inmates to show that they faced a "substantial risk of serious harm" before they suffered an injury. 511 U.S. at 834, 114 S.Ct. 1970. When this substantial risk of serious harm arises from a physical or mental impairment, the Court has added that "serious medical needs" can satisfy this objective element. *Estelle*, 429 U.S. at 104, 97 S.Ct. 285; *see Phillips v. Tangilag*, 14 F.4th 524, 534 (6th Cir. 2021).

Adapting these standards to the suicide context, our cases have held that death by suicide amounts to a serious harm—indeed, the most serious of harms. *See Barber*, 953 F.2d at 239-40. Yet what facts create a "substantial risk" that inmates will suffer this harm? *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970. We have repeatedly stated that the estates of deceased inmates can satisfy this element by showing that the inmates suffered from "psychological needs" that led them to have "suicidal tendencies." [citations omitted.]

At the same time, we have yet to clarify what we mean by "suicidal tendencies" or what types of words or actions qualify. Some cases suggest that an inmate's pre-suicide statements and conduct must reveal an objectively "strong likelihood" that the inmate would try to commit suicide. [citations omitted.] These cases have looked to such objective factors as whether inmates recently attempted suicide, or whether they threatened to harm themselves. [citations omitted.] But other cases suggest that the estates of deceased inmates can "easily" meet the objective element – essentially on the ground that the suicide itself revealed the inmates' suicidal tendencies. [citation omitted.]. Officers in some of our cases thus have not even disputed this element. [citations omitted.]

*Subjective Element*. Most of our cases addressing inmate suicides instead turn on *Farmer*'s subjective element. This element requires an inmate to prove that an officer knew of the facts creating the substantial risk of serious harm. *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970. As noted, moreover, the inmate must also prove that the officer believed that this substantial risk existed. *Id*. And even if an officer knows of the substantial risk, the inmate must lastly show that the officer "responded" to the risk in an unreasonable way. *Id*. at 844, 114 S.Ct. 1970; *see Beck*, 969 F.3d at 601-02.

This framework creates a "demanding" test when an estate of a deceased inmate challenges an officer's failure to prevent a suicide. *Galloway*, 518 F. App'x at 335. After all, inmates often take their lives "without warning," so jail staff will find it "difficult" to identify the inmates who pose substantial suicide risks. *Andrews v. Wayne County*, 957 F.3d 714, 717 (6th Cir. 2020) (quoting *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005)). To account for this unpredictability, we have held that an estate must prove more than that an officer knew of a "possibility" or "even a likelihood" of the suicide. *Downard*, 968 F.3d at 601 (quoting *Galloway*, 518 F. App'x at 336). Rather, the officer must have believed that a "strong likelihood" existed that the inmate would commit suicide. *Barber*, 953 F.2d at 240; *see Downard*, 968 F.3d at 601.

How can an estate make this showing? Because the question concerns an officer's state of mind, an estate can prove this factual issue "in the usual ways" that plaintiffs try to show a defendant's mindset in other contexts – with either direct or circumstantial evidence. *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970; *cf. Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100, 123 S.Ct. 2148, 156 L.Ed.2d 84 (2003). In rare situations, direct evidence might show that a defendant knew an inmate would try to commit suicide. A jail doctor, for example, might have diagnosed the inmate as suicidal. *See Comstock*, 273 F.3d at 704; *see also Galloway*, 518 F. App'x at 333-34; *Perez*, 466 F.3d at 425; *Linden*, 167 F. App'x at 427.

Most of the time, though, officers will not admit that they knew of the strong likelihood that inmates would try to kill themselves. *See Stewart v. Warren Cnty. Bd. of Comm'rs*, 821 F. App'x 564, 570 (6th Cir. 2020). So an estate must often rely on "circumstantial evidence" to establish this knowledge. *Bonner-Turner*, 627 F. App'x at 407. This type of evidence can create a jury question about an officer's state of mind if the facts that the officer knew made it "obvious" that a strong likelihood existed that an inmate would commit suicide. *Farmer*, 511 U.S. at 842, 114 S.Ct. 1970; *see Downard*, 968 F.3d at 600-01; *Stewart*, 821 F. App'x at 571; *Broughton*, 656 F. App'x at 57.

Yet our caselaw sets a "high bar" for plaintiffs who try to prove an officer's knowledge in this circumstantial way. *Downard*, 968 F.3d at 601. We have typically required evidence that an officer knew of an inmate's "suicide watch" classification or of other equally revealing facts. *Id*.; *see Cooper*, 222 F. App'x at 469. As one example, we found this high bar met when an inmate told officers that he was suicidal and needed to go to the hospital and when the officers knew that he had recently been released from a mental-health facility. *See Bonner-Turner*, 627 F. App'x at 408-10. As another example, we found the bar met when an officer knew of the inmate's past suicide attempts, knew that the inmate had recently been placed on suicide watch, and knew that the inmate was complaining of pain and crying out to go to the hospital. *See Schultz v. Sillman*, 148 F. App'x 396, 401-03 (6th Cir. 2005).

11

The facts of many other cases, by contrast, have fallen short.  We, for instance, granted summary judgment to an officer even though she knew that the deceased inmate seemed despondent.  *Downard*, 968 F.3d at 601-02; *see also Baker-Schneider*, 769 F. App'x at 193-94.  Likewise, we granted summary judgment to medical staff even though they knew that the deceased inmate had been suffering from drug withdrawals and refusing medication and meals.  *See Broughton*, 656 F. App'x at 57-58; *see also Stewart*, 821 F. App'x at 571-72; *Grabow*, 580 F. App'x at 310-11. And we granted summary judgment to a jail doctor who knew of an inmate's prior attempt to harm himself and recent suicidal thoughts because the inmate had said that he no longer felt suicidal.  *See Nallani*, 665 F. App'x at 507-08; *see also Mantell*, 612 F. App'x at 303, 306-07; *Starcher v. Corr. Med. Sys., Inc.*, 7 F. App'x 459, 465 (6th Cir. 2001).

*Lawler*, 93 F.4th at 928-30.[3]  With these rules in mind, the Court will address Ms. O'Neil's claim of qualified immunity.

The record reflects that Mr. Lovell was admitted to the hospital for treatment of suicidal ideations on December 12, 2020. *See* Hospital Records (ECF No. 89-2, PageID.2328-2333).  While in the hospital, Lovell allegedly committed first degree arson, was arrested, and then transferred to the Jail on December 15, 2020.  *See* Booking Report (ECF No. 89-5. PageID.2438); Nursing Progress Note (ECF No. 84-9, PageID.1424) (Notes from the hospital reported to "[t]he staff member at the jail" that that Mr. Lovell "reported having hallucinations and self-reported starting the fire" at the hospital).

As to the objective element, Ms. O'Neil states,

There is no serious dispute that it was appropriate to place Chase Lovell in the MPAD cell once he arrived in the jail on December 15, 2020. At that time, Lindsey O'Neil had limited information available to her. She called and spoke to a nurse at Ascension Borgess Hospital. The Ascension Borgess nurse documented the call and the information provided. (Exhibit H, Borgess Nurse Note). There is no mention of Chase Lovell having active suicidal thoughts or behavior on December 15, 2020. Ascension Borgess Hospital did not send the discharge summary to the jail until December 17, 2020. *See* (Exhibit N, Fax of Borgess

---

[3] The Court notes that after setting out the caselaw applicable to the objective element, the Sixth Circuit did not address that element in the *Lawler* opinion, stating "We opt not to resolve the objective element given the uncertainty in our caselaw on what it requires," *Lawler*, 93 F.4th at 930.

12

Discharge Summary 12-17-2020). Lindsey O'Neil did review prior ISK mental health records which indicated Chase Lovell had a mental health diagnosis, prior psychiatric hospitalizations, and a prior suicide attempt. (Exhibit I, O'Neil 12-15-20 Note). Lindsey O'Neil then made the recommendation that the jail correctional staff initially place Chase Lovell in MPAD until an assessment could occur. (*Id*.).

ISK defendants' Brief at PageID.1342.

Ms. O'Neil contends that there was no basis to keep Mr. Lovell in the MPAD cell

after December 15th:

On December 16, 2020, Ms. O'Neil evaluated Lovell. (Exhibit J, O'Neil 12-16-20 Note). Chase denied suicidal ideation. (*Id*.). He indicated a desire to get out of the solitary MPAD cell and to wear normal jail clothes (instead of the suicide prevention garment). There was no other additional information available to Lindsey O'Neil on December 16, 2020 – Ascension Borgess Hospital did not fax the discharge summary until December 17, 2020. There simply was no indication at that time of an objectively serious risk of suicide sufficient to warrant continued housing in the MPAD cell. Rather, there was an objectively serious risk of "causing him more distress" by keeping him in the padded cell and gown. (Exhibit K, O'Neil Dep Tr, pp. 75, 77). Since Chase Lovell denied suicidality, there was no indication of Chase Lovell being untruthful at that time, and there was an objectively serious risk of harm posed by leaving Chase Lovell in MPAD, Lindsey O'Neil appropriately recommended changing Chase Lovell's housing status but also recommended that correctional deputies and staff continue to monitor him.

*Id*. at PageID.1341-1342.

In this regard, Ms. O'Neil testified regarding Lovell's condition on December 16th

as follows:

Q.    . . . And you did this a little bit earlier, but can you tell me what a SPG or suicide prevention blanket is?

A.    So there's a suicide prevention gown, which is what somebody wears, and that's attached with Velcro.  There's also a blanket that has been provided to them. It is typically green.  And my understanding of the technology of this blanket is that it has no ability to tie it or wrap it around yourself.

Q.    And whose decision would it have been to place him in medical with that suicide prevention blanket, do you know?

A.    Captain Price and myself.

13

Q.    Can you tell me why you two came to the conclusion that he should be placed with a suicide prevention blanket?

A.    Because of his previous risk.  And that at times while a person could be not suicidal at one point, that could return.    So trying to move him through the continuum of placement in the jail, but not give him access to things that he could potentially hurt himself with.

Q.    Would it be fair to say that you had concerns at that point that he may still be suicidal?

A.    I was aware that based on his history, that that could return.

O'Neil Dep. (ECF No. 84-12, PageID.1446).

Based on this record, the court concludes that a genuine issue of material fact exists with respect to the objective element, *i.e.*, whether Mr. Lovell suffered from psychological needs that led him to have suicidal tendencies on Decembe6, 2020.

Next, Ms. O'Neil contends that the subjective element was not met because she did not consciously disregard Mr. Lovell's known needs.

Ms. O'Neil consulted with the nursing staff from Ascension Borgess Hospital before Chase's arrival to the jail on December 15, 2020. (Exhibit H, Borgess Nurse Note [ECF No. 84-9]); (Exhibit I, O'Neil 12-15-20 Note [ECF No. 84-10]). She initially recommended placing Lovell in a padded cell and a suicide prevention gown due to a history of suicidal ideations and alcohol withdrawal. (Exhibit I, O'Neil 12-15-20 Note [ECF No. 84-10]). On December 16, 2020, she assessed Lovell. (Exhibit J, O'Neil 12-16-20 Note [ECF No. 84-11]). Chase denied thoughts of self-harm or suicide. (Id.). He asked for normal jail clothing. (*Id*.); (Exhibit K, O'Neil Dep Tr, p. 76 [ECF No. 84-12]). Lindsey O'Neil discussed with Captain Amy Price, and they decided to place Chase in the medical unit (due at least in part to the need to continue COVID quarantine protocols in place at the time). Lindsey O'Neil specifically indicated to correctional staff: "continue to monitor." (Exhibit L, Shift Log Report [ECF No. 84-13]). Following Lindsey O'Neil's assessment and making her recommendations, Chase had a court hearing and then was seen by another member of ISK's staff, Michael Rigling. Chase again denied suicidal thoughts. (Exhibit M, Rigling 12-16-20 Note [ECF No. 84-14]). There simply is no evidence of any ISK personnel knowing of and consciously disregarding serious objective signs of suicidality – because there were no signs of suicidality on December 16, 2020.

14

ISK defendants' Brief at PageID.1343 (emphasis omitted).

Plaintiff contends that Ms. O'Neil had no reason to remove Mr. Lovell from the padded cell so quickly after his hospitalization and subsequent arrest for setting a fire at the hospital.  *See* Plaintiff's Response (ECF No. 89, PageID.2314).  Ms. O'Neil admits that she had concerns that Chase would act on his suicidal ideations, yet still cleared him from the MPAD cell because Chase said he wanted his clothes back:

> Q      And I believe you said your other recommendation was that he be removed from the suicide prevention gown.
>
> A.      Correct.
>
> Q.      Any other recommendations you made to Captain Price at that time?
>
> A.      That the blanket he be provided with still be the suicide prevention blanket.
>
> Q.      Did you recommend that he also be placed in a cell with regular sheeting and bedding?
>
> A.      No.
>
> Q.      Why not?
>
> A.      Because I felt that that was an added risk; that the suicide prevention blanket was sufficient to keep him warm, but didn't add -- the majority of attempts that we see in the jail are through sheets and blankets.
>
> Q.      Is there ever a time that you would recommend that somebody be placed with a suicide prevention blanket and regular bedding and sheeting?
>
> A.      No.  There would be no need for that.
>
> Q.      Okay.  Can you elaborate a little bit?
>
> A.      They would either get one or the other.  I'm going to give someone a sheet and a blanket.  The purpose of them having a suicide prevention blanket is not there anymore.
>
> Q.      Does it defeat the purpose?

15

A.      It defeats the purpose, yes.

Q.      Any other recommendations you made?

A.      We together -- and again, we often coordinate these decisions together with command and kind of discuss security as well as placement.  Ultimately the decision on placement always falls on the jail on where they house people, as we are simply making recommendations.
        It was recommended that -- in the tower you can choose what cells you have up on camera, and it was recommended that his cell always be up on camera.

. . . .

Q.      And it was your recommendation that the camera inside Chase Lovell's cell be permanently on one of the monitors rather than being rotated through; is that accurate?

A.      I can't recall if that was my recommendation or Captain Price's, but that was one of the decisions that was -- or recommendations that was made, yes.

Q.      It appears to me that based on these recommendations, both you and Captain Price still had some concerns regarding Chase Lovell's mental health, suicide risk.  Is that a fair characterization?

A.      Yes.

Q.      Why not just keep him in the medically-padded cell with the suicide prevention gown.

A.      Because in my opinion at the time, he was not actively suicidal to act on that.  I was also prepared for Chase to be in the jail longer term.  He was very insistent that he was not going to harm himself and that being in a padded cell and in that gown was causing him more distress.

O'Neil Dep. at PageID.1450-1451.

        Non-party Capt. Price testified that Ms. O'Neil wanted to move Mr. Lovell to the

general population.  Price Dep. (ECF No. 88-7, PageID.1756).  Price disagreed and ultimately

Lovell was not moved to the general population.  *Id*.  Price testified that it was her decision not to

move Lovell to general population and instead put him in a medical cell. *Id*. Price gave the following reasons for her decision:

> There were a lot of unknowns with this man. The information that I recall from the arresting officer was that he was in Borgess One North, he had set fire to the hospital and had tried to run, so he was considered an escape risk. At that time I wanted to monitor his behavior longer before a determination was made for him to be able to go to general population.
>
> And I also believe at that time we had a quarantine process as well, so he would not have been eligible.

*Id*.

Capt. Price also testified about the circumstances related to issuing a suicide prevention blanket to Mr. Lovell for use in the medical cell:

> Q.    Based upon the records, somebody had recommended that Chase Lovell be given a suicide prevention blanket when he was moved into the medical cell. Do you know who made that recommendation?
>
> A.    I can tell you that I suggested he be given a suicide blanket to Lindsey, but she would have the final say in that, that's her role if she chose to give it to him. But it seems like she had mentioned that he was cleared, but he was like a scared little boy and I believe I suggested the blanket to help him stay warm, cover up, that kind of thing.
>
> Q.    So is it your testimony that you suggested the suicide prevention blanket merely to keep Chase Lovell warm?
>
> A.    Yeah, it had to do with the conversation, during the conversation about him being scared. And those blankets are heavy and sometimes they could have a calming, maybe, effect. But it was during that part of the conversation, to the best of my recollection.
> And again, Mr. Joseph [plaintiff's attorney], it was merely a suggestion for her during that conversation.

*Id*.

Plaintiff also points to one of his experts, Dr. Gerald Shiener, who testified that Ms. O'Neil knew a number of underlying facts (*e.g.*, "[s]he knew that suicide was on his mind" and

17

that "patients who don't want help but who have made up their mind to kill themselves will not disclose suicidal thoughts"), and yet "she still sent him to a less restrictive environment when there was no real need or indication to do so." Dr. Shiener Dep. (ECF No. 89-12, PageID.2857). Ms. O'Neil contends that the testimony of plaintiff's experts does not create a question of fact because their opinions are speculative and therefore inadmissible and that "there are issues" with each of plaintiff's expert opinions,

> In particular, as it relates to this motion, the reports of Mr. Katsaris, Ms. Kero and Dr. Shiener show that they improperly speculate on the ultimate issue to be decided by the trier of fact. They repeatedly opine that the ISK Defendants were deliberately indifferent and that their testimony is not credible.

ISK defendants' Brief at PageID.1347.

Based on this record, the Court concludes that plaintiff has presented sufficient evidence to demonstrate that genuine issues of material fact exist with respect to Ms. O'Neil's subjective intent, *i.e.*, whether Ms. O'Neil believed that a strong likelihood existed that Mr. Lovell would commit suicide and whether she responded to the risk in an unreasonable way.

With respect to plaintiff's expert witnesses, Ms. O'Neil contends that the experts "use flawed methodology by failing to accurately observe which information was available to the ISK defendants on December 15 and 16, 2020." *Id*. In this regard, Ms. O'Neil points out that her experts "refute and rebut the opinions of Plaintiff's experts" citing "(Exhibit S, Dr. Stoltz Report); (Exhibit T, Dr. Carter Report); (Exhibit U, Jessica Patterson, LCSW Report); (Exhibit V, Nikki Johnson, PsyD Report)." *Id*. at PageID.1348, fn. 4. In short, the parties rely on conflicting opinions presented by their respective expert witnesses.

While defendant seek to impugn the credibility of plaintiff's expert witnesses, the undersigned cannot determine the credibility of expert witnesses at the summary judgment stage.

At this stage, the undersigned views the evidence, including the evidence presented by experts, in the light most favorable to the non-moving part.  Deciding the outcome of this "battle of experts" is a question for the finder of fact at trial.  *See Automotive Experts, Inc. v. Kallberg*, No. 3:19-CV-00982, 2021 WL 2260058 at \*17 (M.D. Tenn. June 3, 2021).

> [W]eighing the credibility of the competing expert reports amounts to improper fact-finding.  *See Rodgers v. Monumental Life Ins. Co.*, 289 F.3d 442, 449 (6th Cir. 2002). Indeed, competing expert opinions present the "'classic battle of the experts' and it [is] up to a jury to evaluate what weight and credibility each expert opinion deserves." *Cadmus v. Aetna Casualty and Surety Co.*, 1996 WL 652769 (6th Cir. Nov.7, 1996) (unpublished) (citation omitted).

*Phillips v. Cohen*, 400 F.3d 388, 399 (6th Cir. 2005).

In this regard, Fed. R. Evid. 702 gives the trial judge a gatekeeping role in screening the reliability of expert testimony.[4]  *See Tamraz v. Lincoln Electric Co.*, 620 F.3d 665, 668 (6th Cir. 2010) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). *See also, Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony.").

For all of these reasons, Ms. O'Neil's motion for summary judgment should be denied.

---

[4] Fed. R. Evid. 702 (eff. Dec. 1, 2023) states:

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case."

### III.    The individual County defendants' motions for summary judgment

As discussed in § II.C., *supra*, a genuine issue of material fact exists as to whether Mr. Lovell met the objective element of the Fourteenth Amendment claim.  The issue for the Court is whether plaintiff presented evidence to support the subjective element of his claim as to each of the individual County defendants under the standard announced in *Farmer* and *Lawler*.[5] Specifically, whether each defendant believed that a strong likelihood existed that Mr. Lovell would commit suicide and whether that defendant responded to the risk in an unreasonable way.

### A.    Deputy Zywicki

Plaintiff alleged that Deputy Zywicki disregarded Mr. Lovell's known risk for suicidal ideations and mental illness by placing towels and bed sheets in his medical cell, which disregarded Capt. Price's order that Lovell be placed in the medical cell with a green suicide prevention blanket out.  *See* Compl. at PageID.19.

On December 15, 2020, Deputy Zywicki received Mr. Lovell from the arresting officers.  Zywicki Dep. (ECF No. 88-9, PageID.1800).  At that time, Kalamazoo Township Officer Howes advised the jail staff that Lovell was suicidal:

> When we arrived at the jail, I did tell the jail staff that they needed to be cautious because Chase could remain calm and could act like there was nothing bothering him.  And based on my experience, that was because he was suicidal and was trying to prevent anyone from stopping him.

Howes Dep. (ECF No. 91-10, PageID.3439).  Zywicki placed Mr. Lovell in a padded cell in medical with a suicide prevention gown (SPG).  Zywicki Dep. at PageID.1800, 1806.

---

[5] In their brief, the individual County defendants (Deputy Zywicki, Sgt. Mitcavish, Deputy Jelsomeno, Deputy Dow and Deputy Boven) refer to the legal standard for qualified immunity. *See* County defendants' Brief (ECF No. 88, PageID.1643-1644).  However, these defendants do not present arguments establishing a qualified immunity defense. Rather, defendants argue that they did not violate Mr. Lovell's Fourteenth Amendment rights. *See id*. at PageID.1644-1654 ("III. The Individual Officers Were Not Deliberately Indifferent to Chase Lovell's Serious Medical Needs").

On December 16, 2020, Deputy Zywicki was given a screening note for Mr. Lovell.

*Id*. at PageID.1820.  The note (e-mail) stated,

> **MPAD – Lovell, Chase**
> Screened by Lindsey/CMH.  Denies he is at srisk [sic] and requesting to be cleared.  Withdrawal symptoms appear to be subsiding as well.  Clear from SPG/PAD.  Place in medical per Capt Price with a green SPG blanket [suicide prevention blanket].  CMH Will [sic] rescreen throughout his time in quarantine and recommend placement prior to moving into population.  Should continue to be monitored.

Email to Sgt. Mitcavish (ECF No. 88-16, PageID.1897).

According to Deputy Zywicki, the reference "clear from SPG/pad" meant that Mr. Lovell "is no longer considered suicidal, so you can give him everything and anything that a – any other inmate is given."  Zywicki Dep. at PageID.1820.  Zywicki continued, "[H]e is cleared.  He is good.  He is not suicidal anymore, according to CMH.  And that's our, that's the person we listen to with regard to those calls." *Id*.

While the screen note "cleared" Mr. Lovell and stated that he was to go to "medical" with a suicide prevention blanket, these instructions did not preclude Deputy Zywicki from giving Lovell a standard bed roll.  Zywicki testified that it would not be abnormal (*i.e.*, "Wouldn't bother me, wouldn't worry me") if an inmate had both an SPG and a bed roll because Lovell had been cleared.  *Id*. at PageID.1821. Zywicki explained,

> [O]nce somebody is cleared as not being suicidal anymore, and you can move them to a regular cell, they get all the property that a inmate would if they were not suicidal, which consists of the cup -- and even after that, they can order from commissary.  They can use the phone.  There is a whole host of things that they have access to.  Now, a book, you know, my partner gave him a book.  He wouldn't be able to have that in a suicide -- in the M-Pad.  So there is a whole host of things that he now has available to him since he is no longer considered suicidal.

*Id*.

21

Plaintiff has provided an "informational report" from Sgt. Mitcavish prepared after Mr. Lovell died.  This report indicates that Deputy Zywicki advised Lt. Faulk that Mitcavish told him to provide towels and sheets for Lovell on December 16th.  The report provides in part,

> Lt. Faulk had me look at the December 16, 2020 log entry from CMH Lindsay O'Neil. I was asked what does that mean to you. I read it and said he was cleared from SPG/PAD, place In medical, per Captain Price with a green SPG blanket. Lt. Faulk said Deputy Zywicki told him I approved towels and sheets. I said no. As the Receiving Sergeant, I do not give CMH screenings verbally, I always print out the CMH screens and call it out for Deputies so that there are no misunderstandings.
>
> Lt. Faulk said Deputy Zywicki had told him that I approved sheets and towels for LOVELL, CHASE DAVID DALTON. I do not recall any conversation with Deputy Zywicki about sheets and towels. If there are questions about CMH screens, I read off the CMH screens and go over it with the Deputy.
>
> I do not remember any conversation with Deputy Zywicki approving sheets and towels for LOVELL. . .

Information Report (ECF No. 91-24, PageID.4255).

In the Court's opinion, Sgt. Mitcavish's report does not create a genuine issue of material fact which precludes summary judgment.   Mr. Lovell had been cleared by "Lindsey/CMH" and was no longer considered suicidal.  Assuming that Mitcavish told Zywicki to give Lovell the sheets and towels, this would be consistent with a person who was cleared of being suicidal.  Based on this record, plaintiff has not presented evidence to establish that Zywicki believed that a strong likelihood existed that Mr. Lovell would commit suicide.  Nor has plaintiff presented evidence that Zywicki responded unreasonably to the situation.  Accordingly, Deputy Zywicki's motion for summary judgment should be granted.

**B.    Sgt. Mitcavish**

Plaintiff alleged that Sgt. Mitcavish disregarded Mr. Lovell's known risk for suicidal ideations and mental illness by ordering Deputy Zywicki to place towels and bed sheets

in his medical cell.  Compl. at PageID.18.  Before officers brought Lovell to the Jail on December 15, 2020, Sgt. Schreiner told Sgt. Mitcavish: that Lovell "had tried to burn down Borgess Hospital"; that he was going to be placed in a green SPG [suicide prevention gown]; that he was going to be placed in an M-pad; that he was "going to be a two-man move in bellies"; and that he may be going through withdrawals.  Mitcavish Dep. (ECF No. 88-12, PageID.1866).

On December 16th, Sgt. Mitcavish spoke with Ms. O'Neil, who told Mitcavish "that she was clearing Chase Lovell, that he was like a ten-year-old mentally, and that he was scared."  *Id*. at PageID.1868.  Ms. O'Neil's reference to "clearing" Lovell meant that "She is clearing him, meaning he is no longer suicidal; he is being cleared."  *Id*.  Mitcavish waited to receive an e-mail on the subject.  *Id*.  After she received the e-mail, Mitcavish printed it and called out on the radio to the deputies that the CMH screens were on the printer.  *Id*. With respect to the clearance, Mitcavish knew that Lovell was moved out of a medical padded cell and moved into a medical cell.  *Id*.

Sgt. Mitcavish's involvement in this matter was limited to distributing the e-mail notifying Jail personnel that CMH had cleared Mr. Lovell.  As discussed, *supra*, even if Mitcavish had told Deputy Zywicki to provide sheets and towels, this was consistent with Lovell being "cleared."  Plaintiff has not presented evidence to establish that Sgt. Mitcavish believed that a strong likelihood existed that Lovell would commit suicide.  Nor has plaintiff presented evidence that Mitcavish responded unreasonably to the situation.  Accordingly, Sgt. Mitcavish's  motion for summary judgment should be granted.

## C.    Deputy Jelsomeno, Deputy Dow, and Deputy Boven

Plaintiff alleged that Deputies Jelsomeno, Dow and Boven were working the shift when Mr. Lovell committed suicide on December 17, 2020, and that they failed to conduct proper

safety and security rounds to check on the decedent as required by policy.  Compl. at PageID.8.

Specifically, plaintiff alleged that,

> 52. The jail's policy was to check on inmates every 30 minutes, but on December 17, 2020, contrary to policy, Defendants failed to do so as required.
>
> 53. Upon information and belief, the last interaction that any of the Defendants had with Chase on December 17, 2020, occurred at approximately 4:57 PM when he handed his dinner tray back to Defendant Dow.
>
> 54. Between the times of approximately 4:57 PM and 6:33 PM on December 17, 2020, while Defendants improperly left Chase alone, Chase used the bed sheets to commit suicide.

*Id*.[6]

The thrust of plaintiff's claim is that the three deputies violated Mr. Lovell's constitutional rights because they failed to monitor him as required by Jail policy.  The failure to follow internal policies, without more, does not constitute deliberate indifference.  *Winkler v. Madison County*, 893 F.3d 877, 891 (6th Cir. 2018). The failure to follow a procedure is at most a form of negligence.  *Id*. at 892.  *See Griffith v. Franklin County, Kentucky*, 975 F.3d 554, 582 (6th Cir. 2020) ("the violation of an internal policy does not establish a constitutional violation"); *Meier v. County of Presque Isle*, 376 Fed. Appx. 524, 529 (6th Cir. 2010) (the failure to comply with policy is not a *per se* constitutional violation); *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir. 1992) (Under § 1983, the issue is whether the officer violated the Constitution, not whether he should be disciplined by the local police force).

As discussed, Mr. Lovell was "cleared", no longer considered suicidal, and placed in a medical cell rather than a medical padded cell.  The medical cells were not the padded cells

---

[6] The Court notes that plaintiff's response includes the following statement, "For the Court's review Plaintiff has attached the relevant portions of the surveillance. (Exhibit 24)."  Plaintiff's Response (ECF No. 91, PageID.3031, fn. 1).  This exhibit was not filed with the Court and is not part of the record in this case.

used for suicide prevention.  *See* Dow Dep. (ECF No. 88-10, PageID.1849 (the cells in the medical unit, aside from M-Pad, are considered to be normal medical cells).  Under the standard operating procedure (SOP) at the Jail, inmates who are a suicide risk are not housed in a medical cell.  *See* Zywicki Dep. (ECF No. 88-9, PageID.1819).  In this regard, Deputy Jelsomeno testified that:

> If they're a suicide risk, they need to be placed in an area where they can be observed and monitored more frequently.  In this particular case, as she stated [referring to defendants' attorney], [Mr. Lovell] was cleared. He was not listed as a suicide risk any longer, and that's not my determination to make as a deputy.

Jelsomeno Dep. (ECF No. 88-8, PageID.1783).

Non-party Capt. Logan Bishop of the Kalamazoo County Sheriff's Department testified that the Jail established a policy for 30-minute rounds in the medical wing, which was the standard for general housing at the facility. Bishop Dep. (ECF No. 88-11, PageID.1857). Assuming that Deputies Jelsomeno, Dow and Boven did not follow the 30-minute policy to check on an inmate, this failure, in and of itself, does not establish a Fourteenth Amendment violation.  Here, Mr. Lovell had been cleared of being a suicidal risk and was housed in a medical cell.  Based on this record, the three deputies had no basis to believe that a strong likelihood existed that Lovell would commit suicide and they did not act unreasonably to the situation.  Accordingly, Deputies Jelsomeno, Dow and Boven's motion for summary judgment should be granted.

## IV.    Kalamazoo County

### 1.    Kalamazoo County is a proper defendant

Defendants contend that the County is not a proper party in this case because "[o]peration of the County Jails falls under the jurisdiction and control of the County Sheriff, not the Counties. MCL 51.75, M.C.L. § 51.281", and "[t]he County Sheriff is an independent

Constitutional Officer and elected official. MICH. CONST. 1963, Art. VII, § 4."  County

defendants' Brief at PageID.1655-1656.  The Court disagrees.

The County employs all of the individual County defendants.  As this Court

previously explained:

> The sheriff's department does not exist as a separate legal entity; it is simply an
> agent of the county.  *Vine v. Cnty. of Ingham*, 884 F. Supp. 1153, 1158 (W.D. Mich.
> 1995) (citing *Hughson v. Cnty. of Antrim*, 707 F. Supp. 304, 306 (W.D. Mich. 1988)
> and *Bayer v. Almstadt*, 185 N.W.2d 40, 44 (Mich. Ct. App. 1970)). . . .
>
> [I]n matters pertaining to the conditions of the jail and to the operation of the
> deputies, the sheriff is the policymaker for the county. Mich. Comp. Laws § 51.75
> (sheriff has the "charge and custody" of the jails in his county); Mich. Comp. Laws
> § 51.281 (sheriff prescribes rules and regulations for conduct of prisoners); Mich.
> Comp. Laws § 51.70 (sheriff may appoint deputies and revoke appointments at any
> time); *Kroes v. Smith*, 540 F. Supp. 1295, 1298 (E.D. Mich. 1982) (the sheriff of "a
> given county is the only official with direct control over the duties, responsibilities,
> and methods of operation of deputy sheriffs" and thus, the sheriff "establishes the
> policies and customs described in *Monell*"). Houghton County and Defendant
> Sheriff McLean, however, may not be held vicariously liable for the actions of
> county employees under § 1983.  *See Connick v. Thompson*, 563 U.S. 51, 60 (2011);
> *City of Canton v. Harris*, 489 U.S. 378, 392 (1989); *Monell v. Dep't of Soc. Servs.*,
> 436 U.S. 658, 694 (1978). Instead, a county is liable only when its official policy
> or custom causes the injury.  *Connick*, 563 U.S. at 60.

*Sauvola v. Michigan Department of Corrections*, No. 2:20-cv-198, 2021 WL 346245 at *4 (W.D.

Mich. Feb. 2, 2021).

Under *Monell*, the County's liability is limited to whether its official policies or

customs caused Mr. Lovell's injuries.  In *Griffith*, 975 F.3d 554, the Sixth Circuit summarized §

1983 municipal liability:

> "A municipality may not be held liable under § 1983 on a *respondeat
> superior* theory – in other words, '*solely* because it employs a tortfeasor.' "
> *D'Ambrosio v. Marino*, 747 F.3d 378, 388-89 (6th Cir. 2014) (quoting *Monell v.
> Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).
> Instead, a plaintiff must show that "through its deliberate conduct, the municipality
> was the 'moving force' behind the injury alleged."  *Alman v. Reed*, 703 F.3d 887,
> 903 (6th Cir. 2013) (quoting *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404, 117

26

S.Ct. 1382, 137 L.Ed.2d 626 (1997)).  A plaintiff does this by showing that the municipality had a "policy or custom" that caused the violation of her rights. *Monell*, 436 U.S. at 694, 98 S.Ct. 2018.  And when a plaintiff seeks to hold a municipality liable on the basis of a facially lawful municipal action which led an employee to violate her rights, she "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at 407, 117 S.Ct. 1382.

There are four methods of proving a municipality's illegal policy or custom. The plaintiff may prove "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations." *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005)).

*Griffith*, 975 F.3d at 580-81 (emphasis in original).

### 2.    No underlying constitutional violation from current policy

As an initial matter, the County has no municipal liability because plaintiff has not demonstrated that its individual employees, Sgt. Mitcavish and Deputies Zywicki, Jelsomeno, Dow and Boven, violated Mr. Lovell's constitutional rights. "[W]here there has been no showing of individual constitutional violations . . . there can be no municipal liability."  *Baker v. City of Trenton*, 936 F.3d 523, 535 (6th Cir. 2019).  *See Griffith*, 975 F.3d at 581 ("The County cannot be liable unless [plaintiff] establishes an underlying constitutional violation.").  Accordingly, the County's motion for summary judgment should be granted on this basis.

### 3.    Plaintiff failed to show that a County policy or custom is unconstitutional

Next, plaintiff's complaint does not differentiate between claims asserted against the County and ISK, simply referring to "Defendant."  Compl. at PageID.23.  The gist of plaintiff's claim is that the defendant County failed to supervise, monitor, and train the Jail staff:

142. Pursuant to 42 U.S.C. § 1983, as well as the Fourth and Fourteenth Amendments to the United States Constitution, Defendant owed Chase certain

27

duties to properly supervise, monitor and train its correctional officers and staff so as to monitor and supervise the jail's prisoners so that they would detect serious medical conditions and facilitate prompt and immediate medical attention and/or transport to a hospital ER.

143. That Defendant, in its representative and official capacity, has maintained a custom and policy of improper training and supervision of its jail employees. Defendant is not protected by governmental immunity when following a policy that deprives individuals of their constitutional rights. *Monell v N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 692 (1978).

*Id*. Plaintiff lists a series of conclusory statements regarding policies or practices by "Defendant" that breached its duties owed to Mr. Lovell's constitutional rights. *See* Compl. at ¶ 145, PageID.24-25.

For purposes of plaintiff's claims against the County, a "policy" includes a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the policymaker. *Monell*, 436 U.S. at 690. Here, plaintiff's complaint does not identify any particular policy which the County enacted which violated Mr. Lovell's constitutional rights.

A "custom" consists of practices which have become permanent and well settled:

[A]lthough the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. As Mr. Justice Harlan, writing for the Court, said in *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-168, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970): "Congress included customs and usages [in § 1983] because of the persistent and widespread discriminatory practices of state officials . . . . Although not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law."

*Id*. at 690-91. Similarly, plaintiff's complaint does not identify any specific custom at the Jail which violated Mr. Lovell's constitutional rights.

28

In his response, plaintiff identifies one "pervasive practice" (*i.e.*, custom) at issue in this lawsuit:

> It is undisputed that Defendants Dow, Boven, and Jelsomeno intentionally broke protocol and failed to conduct rounds in 30-minute intervals. In fact, Chase Lovel was not found until an hour and a half after leaving the view of the live feed camera in his cell and hanging himself. Further, nearly every individual defendant testified to the importance of visual observation during rounds.
>
> The excessive use of "exceptions" to excuse the failure of conducting rounds was a pervasive practice within the jail. Deputy Jelsomeno testified that it wasn't unusual for the exception button to be used more than ten times in a shift.
>
> Q.    Would it be unusual to have to hit the exception button more than five times during a shift?
>
> A.    On a Friday or Saturday night, no.
>
> Q.    More than ten times?
>
> A.    Maybe more than ten times… Ex. 19 at 38.
>
> Defendant, Mitcavish, testified that as part of her duties in December of 2020, she was to ensure that rounds were being conducted in the required 30-minute intervals. Ex. 20 at 45. She further testified that if rounds are not being conducted in 30-minute intervals, that there is a formal process for discipline. *Id*. Defendant, KCJ, has produced no documents indicating that any disciplinary action was taken as a result of this incident. In fact, even in light of Defendant Jelsomeno's testimony that exception buttons were used in excess of ten times a shift, Defendant Mitcavish testified that she would rarely reprimand deputies. *Id*. at 45-46.

Plaintiff's Response (ECF No. 91, PageID.3066-3067) (emphasis omitted).

Plaintiff contends that this custom presents a question of material fact regarding his *Monell* claim.  However, plaintiff does not present any authority explaining how the excessive use of the "exception button" is a custom which rises to the level of a federal constitutional violation or how Sgt. Mitcavish's actions amounts to an failure to train employees.[7]  "[I]ssues adverted to

---

[7] The Court notes that failing to monitor a detainee in a suicide prevention cell raises a separate issue from the failure to perform the 30-minute rounds in a medical cell.  Suicide prevention cells "are observed constantly from the tower and officers assigned to the suicide prevention wing are never pulled off their rounds. (ECF 88-20, PageID.1929-30;

in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed

waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).  "It is not sufficient for a party

to mention a possible argument in a most skeletal way, leaving the court to  . . . put flesh on its

bones." *Id*. at 995-96.  Accordingly, the County should be granted summary judgment.

## V.    ISK

As discussed in § IV, plaintiff's complaint does not allege any specific policy or

custom which violated Mr. Lovell's constitutional rights.  In his response, plaintiff identifies the

following violation by ISK,

> Here, Plaintiff has sufficiently pled that Defendant Integrated Services of
> Kalamazoo maintained a series of policies, customs, and practices that constituted
> a moving force in the constitutional violations Plaintiff's decedent. . . .
>
> Defendants knowingly violated their own policies and procedures by
> moving Chase from an MPAD cell to a medical cell when they still have concerns
> about his suicide risk. Defendant's Exhibit K at 75 [ECF No. 84-12, PageID.1451].
> Defendants intentionally disregarded Chase's suicide risk and chose to remove him
> from the environment that provided him the most safety.

Plaintiff's Response (ECF No. 89, PageID.2322).  Plaintiff is apparently referring to the "policies

and procedures" which may be gleaned from page 75 of Ms. O'Neil's deposition testimony related

to why she transferred Mr. Lovell from the padded cell.  The Court addressed this testimony in §

II.C., *supra*.  *See* O'Neil Dep. at PageID.1450-1451.

Plaintiff contends that ISK's "policies and procedures" present a question of

material fact regarding his *Monell* claim.  However, plaintiff does not identify a policy which Ms.

O'Neil violated or present any authority on how this unidentified policy rises to the level of a

federal constitutional violation.  Rather, plaintiff refers to Ms. O'Neil's decision to remove Mr.

---

ECF 88-10, PageID.1835 at 34-35)." *See* County defendants' Reply (ECF No. 96, PagID.4296).  Here, Mr. Lovell
was not subject to constant observation in a suicide prevention cell.  Rather, he was assigned to a medical cell subject
to the standard 30-minute rounds and the use of the "exception button".

Lovell from the medically-padded cell.  *See* Plaintiff's Response at PageID.2318-2322.  "It is not sufficient for a party to mention a possible argument in a most skeletal way, leaving the court to  . . . put flesh on its bones."  *McPherson*, 125 F.3d at 995-96. Accordingly, ISK should be granted summary judgment.

## VI.    Plaintiff's ADA claim

Finally, plaintiff alleged that the County and ISK violated the ADA.  "Title II of the Americans with Disabilities Act provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.'"  *Gohl v. Livonia Public Schools School District*, 836 F.3d 672, 681 (6th Cir. 2016) (quoting 42 U.S.C. § 12132).

> To establish a prima facie case of intentional discrimination under Title II of the ADA, a plaintiff must show that: (1) she has a disability; (2) she is otherwise qualified; and (3) she was being excluded from participation in, denied the benefits of, or subjected to discrimination under the program because of her disability .

*Anderson v. City of Blue Ash*, 798 F.3d 338, 357 (6th Cir. 2015) (footnote omitted).

Plaintiff's ADA claim is that Mr. Lovell suffered from a disability comprised of depressive disorder, suicidal ideation, and other psychological disorders, and that defendants failed to accommodate his disability by failing to provide him with "ongoing adequate medical and mental health care, and when he threatened to commit suicide, transferring him to a safe location and properly supervising and monitoring him."  Compl. at PageID.27-28.

The ADA is not an appropriate federal cause of action to challenge the sufficiency of medical or mental health treatment.  *See Carnahan v. Luther*, No. 1:24-cv-319, 2024 WL 2952724 at *6 (W.D. Mich. June 12, 2024) (citing *Baldridge-El v. Gundy*, No. 99-2387, 2000 WL

1721014 at *2 (6th Cir. Nov. 8, 2000) ("[N]either the RA nor the ADA provide a cause of action for medical malpractice."); *Centaurs v. Haslam*, No. 14-5348, 2014 WL 12972238 at *1 (6th Cir. Oct. 2, 2014) ("Although [Plaintiff] may have a viable civil rights claim under 42 U.S.C. § 1983 for inadequate medical care, he has failed to state a prima facie case under the parameters of the ADA."); *Powell v. Columbus Medical Enterprises, LLC*, No. 21-3351, 2021 WL 8053886, at *2 (6th Cir. Dec. 13, 2021) ("This dissatisfaction necessarily sounds in medical malpractice, which, 'by itself, does not state a claim under the ADA.' "). *See also*, *Watson v. Mohr*, No. 2:17-CV-457, 2017 WL 6383812 at *5 (S.D. Ohio Dec. 14, 2017), *R&R adopted*, 2018 WL 836484 (S.D. Ohio Feb. 13, 2018) ("Neither medical treatment decisions nor medical malpractice, however, may form the basis of a claim under the ADA.").   "Put another way, the ADA does not provide a cause of action to challenge the adequacy of the treatment of disabilities." *Whitley v. Michigan Department of Corrections*, No. 1:22-cv-448, 2022 WL 16847679 at *3 (W.D. Mich. Nov. 10, 2022). Accordingly, the County and ISK should be granted summary judgment on the ADA claim.

## VII.    Recommendation

Accordingly, I respectfully recommend that the ISK defendants' motion for summary judgment (ECF No. 84) be **GRANTED** as to defendant ISK and **DENIED** as to defendant O'Neil.

I further recommend that the County defendants' motion for summary judgment (ECF No. 88) be **GRANTED**.

I further recommend that defendants ISK, Kalamazoo County, Jelsomeno, Zywicki, Dow, Boven, and Mitcavish be **DISMISSED** from this action.

Dated:  August 5, 2024                    /s/ Ray Kent
                                          RAY KENT
                                          United States Magistrate Judge

ANY OBJECTIONS to this Report and Recommendation must be served and filed with the Clerk of the Court within fourteen (14) days after service of the report.  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to serve and file written objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).